**Slip Op. 13-46**

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **DONGGUAN SUNRISE FURNITURE CO., LTD., TAICANG SUNRISE WOOD INDUSTRY CO., LTD., TAICANG FAIRMONT DESIGNS FURNITURE CO., LTD., and MEIZHOU SUNRISE FURNITURE CO., LTD.,**<br><br>Plaintiffs,<br><br>**LONGRANGE FURNITURE CO., LTD.,**<br><br>Consolidated Plaintiff,<br><br>**COASTER COMPANY OF AMERICA, COE LTD., LANGFANG TIANCHENG FURNITURE CO., LTD., and TRADE MASTERS OF TEXAS, INC.,**<br><br>Intervenor Plaintiffs,<br><br>v.<br><br>**UNITED STATES,**<br><br>Defendant,<br><br>**AMERICAN FURNITURE MANUFACTURERS COMMITTEE FOR LEGAL TRADE, and VAUGHAN-BASSETT FURNITURE COMPANY, INC.,**<br><br>Intervenor Defendants. | **Before: Jane A. Restani, Judge**<br><br>**Consol. Court No. 10-00254** |

## OPINION AND ORDER

[Antidumping Remand Results Remanded to Commerce.]

Dated: April 5, 2013

Peter J. Koenig and Christine J. Sohar Henter, Squire Sanders (US) LLP, of Washington,

DC, for the plaintiffs.

      Lizbeth R. Levinson and Ronald M. Wisla, Kutak Rock LLP, of Washington, DC, for consolidated plaintiff.

      Susan L. Brooks, Jill A. Cramer, Jeffrey S. Grimson, Kristin H. Mowry, and Sarah M. Wyss, Mowry & Grimson, PLLC, of Washington, DC, for the intervenor plaintiffs.

      Stuart F. Delery, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, Stephen C. Tosini, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant.  Of counsel on the brief was Rebecca Cantu and Scott D. McBride, Attorneys, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce.

      Joseph W. Dorn, Daniel L. Schneiderman, J. Michael Taylor, and Mark T. Wasden, King & Spalding, LLP, of Washington, DC, for intervenor defendants.

      Restani, Judge:  This matter comes before the court following the court's decision in Dongguan Sunrise Furniture Co. v. United States, 865 F. Supp. 2d 1216, 1223 (CIT 2012) ("Dongguan"), in which the court remanded Wooden Bedroom Furniture From the People's Republic of China: Final Results and Final Rescission in Part, 75 Fed. Reg. 50,992, 50,992 (Dep't Commerce Aug. 18, 2010) ("Final Results") to the U.S. Department of Commerce ("Commerce").  For the reasons stated below, the court finds that Commerce complied with the court's remand instructions with regard to the calculation of the wage rate and has provided a reasonable explanation for its zeroing methodology.  See Amended Final Results of Redetermination Pursuant to Court Order (Dep't Commerce Oct. 26, 2012) (Docket No. 125) ("Remand Results").  Commerce has not provided substantial evidence for its calculation of the partial adverse facts available ("AFA") rates or the use of Insular Rattan and Native Products Corp.'s ("Insular Rattan") financial statement.  Thus, Commerce's Remand Results are sustained in part and remanded in part.

## BACKGROUND

The facts of this case have been documented in the court's previous opinion.  See
Dongguan, 865 F. Supp. 2d at 1224–25.  The court presumes familiarity with that decision but
briefly summarizes the facts relevant to this opinion.

Plaintiffs Dongguan Sunrise Furniture Co., Ltd., Taicang Sunrise Wood Industry
Co., Ltd., Taicang Fairmont Designs Furniture Co., Ltd., and Meizhou Sunrise Furniture Co.,
Ltd. (collectively "Fairmont"); Intervenor Plaintiffs Coaster Company of America, COE Ltd.,
Langfang Tiancheng Furniture Co., Ltd., and Trade Masters of Texas, Inc. (collectively
"Coaster"); and Intervenor Defendants American Furniture Manufacturers Committee for Legal
Trade and Vaughan-Bassett Furniture Company, Inc. (collectively "AFMC") challenged the Final
Results of the administrative review of the antidumping duty ("AD") order on wooden bedroom
furniture from the People's Republic of China.  See Dongguan, 865 F. Supp. 2d at 1223 & n.1.
Upon consideration of the parties' motions for judgment on the agency record, the court held,
inter alia, that substantial evidence did not support Fairmont's assigned partial AFA rate of
216.01%.  Id. at 1232–34.  The court remanded for Commerce to reconsider: (1) Fairmont's
partial AFA rate; (2) the calculation of the wage rate; (3) the use of Insular Rattan's financial
statement; and (4) Commerce's zeroing methodology.  See id. at 1253.

On remand, Commerce: (1) calculated four new partial AFA rates for Fairmont
based on data from Fairmont's reported sales; (2) calculated the wage rate using industry-specific
data;[1] (3) continued to rely on Insular Rattan's financial statement; and (4) provided an

---

[1] In Dongguan, the court held that Commerce's use of economy-wide manufacturing
sector data and its reliance on data from India, which may have been distorted by a wage cap,

(continued...)

explanation for its zeroing methodology.  Remand Results at 2.  To calculate the partial AFA

rates, Commerce grouped the unreported sales into four categories based on product type:

armoires, dressers without mirrors, nightstands, and drawer chests/other chests.  Id. at 5.

Commerce then determined a margin for each product type by selecting the single highest

CONNUM-specific margin below 216.01% for a corresponding reported product type.  Id. at 5,

Chart A.  The resulting AFA dumping margin rates are 182.15% for armoires, 215.51% for

chests, 134.42% for nightstands, and 183.52% for dressers.  Id. at 31 n.61.

Fairmont challenges the selected partial AFA rates and requests that the court stay

proceedings until the Federal Circuit addresses Commerce's zeroing methodology.  Corrected Pl.

Fairmont Comment on Remand Results ("Fairmont Cmts.").  AFMC challenges Commerce's

continued use of Insular Rattan's financial statements.  AFMC's Comments Concerning

Commerce's Final Results of Redetermination Pursuant to Court Remand ("AFMC Cmts.").

Defendant United States asks the court to sustain the Remand Results.  Def.'s Resp. to AFMC's

and Fairmont's Remand Comments ("Def.'s Resp.").

---

[1](...continued)
were not supported by substantial evidence.  865 F. Supp. 2d at 1235–39.  On remand,
Commerce relied on industry-specific data to recalculate the surrogate wage rate.  Remand
Results at 8–12.  The industry-specific data did not include data from India and thus, Commerce
did not need to reach the issue of whether Indian data were distorted by a wage cap.  Id. at 12.
No party contests Commerce's determination on remand related to the calculation of the wage
rate, and the court may reasonably infer that the parties concur in the resolution of those issues,
as set forth in the Remand Results.  See JTEKT Corp. v. United States, 780 F. Supp. 2d 1357,
1367 (CIT 2011).  Accordingly, the court sustains Commerce's determinations on remand related
to the calculation of the wage rate.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c).  The court will not uphold Commerce's final determination in an AD review if it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ."  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.   Fairmont's AFA Rates

Fairmont argues that the partial AFA rates are not supported by substantial evidence because they are aberrantly high, they are based on sales with unusually low prices and high freight costs, and they are based on a de minimis quantity of sales.  Fairmont Cmts. 2–5.  Defendant argues that the partial AFA rates are supported by substantial evidence because they are based on Fairmont's own data, they were calculated with a larger percentage of total sales than were used in <u>Ta Chen</u> and <u>PAM</u>,[2] and some of Fairmont's reported sales were dumped at margins above the selected margins.  Def.'s Resp. 4–5.  Fairmont's claim has merit.

If an interested party has failed to cooperate in not providing valid data from which Commerce can calculate an AD rate, Commerce may calculate a rate using inferences which are "adverse to the interests of that party in selecting from among the facts otherwise available."  19 U.S.C. § 1677e(b).  In doing so, Commerce may rely on information derived from the petition, a final determination in the investigation, any previous review, or any other information placed on the record.  <u>Id.</u>  Because Commerce has selected AFA rates based on data

---

[2] <u>PAM, S.p.A. v. United States</u>, 582 F.3d 1336 (Fed. Cir. 2009); <u>Ta Chen Stainless Steel Pipe, Inc. v. United States</u>, 298 F.3d 1330 (Fed. Cir. 2002).

obtained during the course of the current review, strict corroboration pursuant to 19 U.S.C.

§ 1677e(c) may not be required.  In any case, the rate selected by Commerce must be supported

by substantial evidence.

      "An AFA rate must be 'a <u>reasonably accurate estimate</u> of the respondent's actual

rate, albeit with some built-in increase intended as a deterrent to non-compliance.'"  <u>Gallant</u>

<u>Ocean (Thai.) Co. v. United States</u>, 602 F.3d 1319, 1323 (Fed. Cir. 2010) (emphasis in original)

(quoting <u>F.lii De Cecco Di Filippo Fara S. Martino S.p.A. v. United States</u>, 216 F.3d 1027, 1032

(Fed. Cir. 2000)).  "Commerce may not select unreasonably high rates having no relationship to

the respondent's actual dumping margin."  <u>Id.</u>  An AFA rate must not be aberrant or punitive, and

it should bear a rational relationship to respondent's commercial reality.  <u>See</u> <u>KYD, Inc. v.</u>

<u>United States</u>, 607 F.3d 760, 767–68 (Fed. Cir. 2010).

      Here, Commerce has based Fairmont's AFA rates on impermissibly small

percentages of sales.[3]  Some of the margins Commerce selected were based on one or two

transactions and some were based on a percentage of sales smaller than the percentages accepted

in <u>Ta Chen</u> and <u>PAM</u>.[4]  <u>Compare</u> <u>Final Analysis Memorandum</u> at Attach. 4 (selected rate of

---

[3]  The AFA rate for dressers was based on 0.007% (by quantity) of total reported dresser without mirror sales; the rate for chests was based on 0.015% of chests; the rate for armoires was based on 0.208% of total armoire sales; and the rate for nightstands was based on 0.379% of nightstand sales.  <u>Analysis Memorandum for the Final Results of Redetermination Pursuant to Court Remand</u> (Sept. 19, 2012), P.R. 19 at Attach. 4 (INT_094957) ("<u>Final Analysis Memorandum</u>")  Fairmont no longer considers this data business proprietary information. Fairmont Cmts. 3 n.4.

[4]  If all of the sales from each product type are considered together, the margins are based on 0.1327% of total reported sales by quantity and 0.0592% by value.  <u>See</u> <u>Final Analysis Memorandum</u> at Attach. 4; Fairmont Br. 3.  Contrary to Defendant's interpretation of the data, none of the margins are based on a percentage of sales that exceeds the percentage relied on in
                                                                      (continued...)

183.52% for dressers based on 0.007% (by quantity) of total dresser sales) with Ta Chen, 298

F.3d at 1339 (finding that 0.04% of respondent's sales reflected a partial AFA rate of 30.95%

where actual sales data was "reflective of some, albeit a small portion, of [respondent's] actual

sales") and PAM, 582 F.3d at 1340 (finding that 0.5% of non-cooperative respondent's sales

supported AFA rate of 45.49%).   The use of Fairmont's own data and Commerce's reliance on

case law does not obviate the necessity of Commerce to provide substantial evidence to

demonstrate a rational relationship between the AFA rates chosen and a reasonably accurate

estimate of Fairmont's actual rate.   See Gallant Ocean, 602 F.3d at 1325 ("Substantial evidence

requires Commerce to show some relationship between the AFA rate and the actual dumping

margin.").   Cases such as Ta Chen and PAM lie at the outer reach of an acceptable percentage of

sales upon which to base an AFA rate and did not involve margins ranging from 130% to over

200%.   See Gallant Ocean, 602 F.3d at 1324 (finding transaction-specific margins insufficient for

corroboration where "Commerce did not identify any relationship between the small number of

unusually high dumping transactions with [respondent's] actual rate"); F.lli De Cecco, 216 F.3d

at 1032 (invalidating the 46.67% AFA rate imposed by Commerce because, inter alia, it "was

many times higher than [respondent's] actual dumping margin").   Generally, a larger percentage

of a party's sales is needed to support a very high margin in order for Commerce to be able to

demonstrate that the sales relied on are representative of the respondent's commercial reality.

---

[4](...continued)
PAM, and only two of the margins are based on percentages that exceed the percentages used in
Ta Chen.   Regardless of how close these percentages are to Ta Chen and PAM, the percentages
of sales relied on are insufficient to link the rates to a reasonably accurate estimate of Fairmont's
actual dumping margin.   Moreover, AFA rate cases are fact-specific, and attempts to reduce
precedent to a calculated rate or percentage of sales are likely oversimplifications.   See Qingdao
Taifa Grp. Co. v. United States, 780 F. Supp. 2d 1342, 1350 n.8 (CIT 2011) ("Taifa IV").

Taifa IV, 780 F. Supp. 2d at 1350 (finding Commerce provided substantial evidence for an AFA

rate of 145.90% where Commerce relied on 36% of the non-cooperative respondent's verified

sales data from the last year in which it cooperated).  Cherry-picking the highest possible margins

below 216.01% does not satisfy Commerce's burden, and reference to the abnormally minuscule

percentages of specific transactions allowed in Ta Chen and PAM does not give a court

confidence in Commerce's choice.

      The record evidence in the instant case demonstrates that the selected margins,

ranging from 134% to 215%, do not reflect Fairmont's commercial reality and are not reasonably

accurate estimates of Fairmont's actual dumping rate for the unreported sales.   Fairmont

cooperated by reporting data for the vast majority of its sales of subject merchandise during the

period of review and received a rate for its reported sales in the range of 34%.  See Dongguan,

865 F. Supp. 2d at 1234; Remand Results at 31.  A calculated rate of 34% for Fairmont's

reported sales suggests that rates ranging from 134% to over 215% are not reflective of

Fairmont's commercial reality, especially when there is no indication that Fairmont failed to

report certain sales for strategic reasons.  See Gallant Ocean, 602 F.3d at 1325 (stating that "the

record showed a large body of reliable information suggesting the application of a much lower

margin").  Commerce has provided no evidence explaining why the selected margins are

reasonable when they are multiples of the rate calculated based on Fairmont's unchallenged

data.[5]  Thus, because the selected margins are based on a minuscule percentage of sales that are

---

[5]  Not only did Commerce fail to provide substantial evidence to support the difference
between the margins for the reported sales and the unreported sales, but Commerce failed to
comply with the court's remand instructions on this same issue.  See Dongguan, 865 F. Supp. 2d
at 1234 (finding that Commerce had not "provided record evidence to justify the difference
(continued...)

insufficient to link the high margins to Fairmont's commercial reality and because the vast

majority of the data on the record indicates a significantly lower margin, Commerce's choice is

not supported by substantial evidence.[6]

       Moreover, Commerce has failed to comply with other aspects of the court's

remand instructions.  In <u>Dongguan</u>, Commerce unsuccessfully attempted to support a 216.01%

rate by noting that 1.2% of Fairmont's total reported sales were dumped at margins above 216%.

<u>Dongguan</u>, 865 F. Supp. 2d at 1233 & n.20.  In rejecting this statistic as insufficient to support

the selected margin, the court stated that Commerce had failed to explain "why a small

percentage of Fairmont's sales can be considered relevant and reliable for Fairmont's unreported

sales." <u>Id.</u> at 1233.  The court also noted that the diversity in product and prices of Fairmont's

sales "suggests using some broader base to derive a partial AFA rate." <u>Id.</u> at 1234.  Here,

Defendant argues that the selected margins reflect Fairmont's commercial reality because

between 1.2% of total reported sales are dumped at margins above the margin selected for chests,

1.4% of sales are dumped at margins above the margins selected for armoires and dressers, and

---

    [5](...continued)
between the rate for the reported sales and 216.01% rate for the unreported sales").

    [6] Defendant is correct that Fairmont should not benefit from its failure to report some of
its sales of subject merchandise by obtaining a more favorable rate than if it had cooperated fully.
Commerce, however, is not permitted to overreach in its application of AFA rates, and it is not
permitted to select "unreasonably high rates having no relationship to the respondent's actual
dumping margin." <u>Gallant Ocean</u>, 602 F.3d at 1323 (citing <u>F.lii De Cecco</u>, 216 F.3d at 1032).
Absent substantial evidence demonstrating a relationship between the high rates selected here
and Fairmont's actual dumping margin, the court cannot find that Commerce complied with the
Federal Circuit's directives in <u>Gallant Ocean</u>.  Commerce has not attempted to support its
margins by suggesting the high rates incorporate a built-in increase for non-compliance, and
Commerce has not provided evidence to suggest that the selected margins are necessary to deter
non-compliance.

3.2% of sales are dumped at margins above the margin selected for nightstands.  Def.'s Resp. 5;

Remand Results Chart A.  Commerce also notes that 2.39% of total sales are within 10% below

the selected margins.  Remand Results Chart B.  Such small percentages of sales have already

been rejected as adequate support in Dongguan, and Commerce again has failed to explain why a

small percentages of total sales can be considered relevant and reliable for the unreported sales,

especially given the diversity in Fairmont's products and prices.  Additionally, Commerce has

not explained, given all the other data undermining its decision, how its choice of margins is

substantially supported based on 2.39% of total sales that are dumped at margins 10% below the

high margins that were selected.  Whether or not this new "test" is useful for other situations, it

does not appear helpful here.

## II.     Insular Rattan's Financial Statement

              AFMC argues that Commerce failed to supply substantial evidence for its decision

to use Insular Rattan's financial statement because the statement cannot be considered complete

and reliable when it is missing a tax line, and Commerce lacks substantial evidence for its

assumption that the company did not receive subsidies.  AFMC Cmts. 2–5.  Defendant argues

that even though the statement is missing a tax line, the statement is nevertheless complete and

reliable because it contains an unqualified opinion from the auditor that the statement is

consistent with the applicable Philippine accounting standards.  Def.'s Resp. 6–7.  Defendant

explains that the auditor's unqualified opinion indicates that there must be an acceptable

explanation for the missing tax line and that taxes must have been properly accounted for in

some other line item.  Id. at 7.  Defendant also argues that because the auditor attested that the

statement was consistent with Philippine accounting standards, which require the disclosure of

subsidies, and because no subsidies were disclosed, there is no evidence that the statement is

distorted by subsidies.  Id. at 10–11.

   In valuing the factors of production, Commerce must rely on the best available

information from the surrogate country.  19 U.S.C. § 1677b(c)(1)(B).  In selecting the best

available information, Commerce looks to "specificity, contemporaneity, and quality of the data."

Issues and Decision Memorandum for the Final Results of the Administrative Review of the

Antidumping Duty Order on Wooden Bedroom Furniture from the People's Republic of China,

A-570-890, POR 1/1/08-12/31/08, at 72 (Aug. 11, 2010) ("Issues and Decision Memorandum"),

available at http://ia.ita.doc.gov/frn/summary/PRC/2010-20499-1.pdf (last visited Mar. 29,

2013).  Commerce selects financial statements based on whether the company: "(1)

manufactured wooden bedroom furniture; (2) had contemporaneous financial statements on the

record; (3) received no subsidies found by the Department to be countervailable; (4) did not

maintain significant retail operations outside of the factory; (5) provided sufficient data for the

Department to calculate surrogate factory overhead, SG&A and profit ratios; and (6) had an

operating profit in 2008."  Id. at 83–84.

   In Dongguan, the court held that Commerce's explanation that there may have

been a tax holiday or some other reason for the lack of a tax line in Insular Rattan's statement

was speculation and could not constitute substantial evidence.  865 F. Supp. 2d at 1243.

Commerce's explanation on remand that Insular Rattan must have supplied a reason for the tax

line and the auditor must have accepted it as legitimate is again speculation.  The record indicates

that the applicable accounting standards require the disclosure of tax expenses.  See Statement of

Financial Accounting Standards No. 1 (revised 2000), App. to the AFMC's Cmts. Concerning

Commerce's Final Results of Redetermination Pursuant to Ct. Remand ("AFMC App."), Tab 2 at Attach. 1, at 21 ¶ 75 ("As a minimum, the face of the income statement should include line items which present the following amounts: . . . [t]ax expense").  Commerce recognizes that tax expenses are a relevant line item that may affect a company's profit and thus, distort the resulting financial ratio.  See Remand Results at 44 (noting that important elements of the statement, such as profit, would be affected by income tax expenses); Issues and Decision Memorandum at 83–84 (stating Commerce relies on profits and receipt of subsidies when selecting among financial statements).

Because Insular Rattan's statement lacks a tax line item, the statement, as it appears on the record, is incomplete and is not consistent with Philippine accounting standards.  Moreover, the same auditor's unqualified opinion was present on Insular Rattan's 2007 financial statement, which Commerce found to be incomplete according to the Philippine accountings standards because it was missing notes and accounting policies.  See Lifestyle Enter., Inc. v. United States, 768 F. Supp. 2d 1286, 1310–11 (CIT 2011) (sustaining Commerce's rejection of Insular Rattan's 2007 financial statement); AFMC App. Tab 2 at Attach. 2 (Insular Rattan's 2007 statement with unqualified opinion from same auditor).  These facts substantially detract from the significance and reliability of the auditor's unqualified opinion.  It is unreasonable for Commerce to conclude that the existence of the auditor's unqualified opinion, which conflicts with the record and which has not been accurate in the past, can stand-in for the missing tax line item.  Thus, Commerce's conclusion that Insular Rattan's financial statement can be considered complete and reliable, even though it is missing a required and relevant line item, is not supported by substantial evidence.

Commerce found that there was no distortion in either profit or subsidies as reported in Insular Rattan's statement because if the company had received a subsidy, it would have reported it.  Commere's assumption that the company would comply with any rule requiring the reporting of subsidies is unreasonable given that the statement did not comply with all reporting requirements when it omitted the tax line item.  Furthermore, Commerce has not provided evidence to show that Insular Rattan was required to report subsidies in its 2008 financial statement.  Commerce's evidence on the record is limited to a proposed International Accounting Standard ("IAS 20") that was issued on January 1, 2012.  Remand Results at 14 n.23 (citing Final Analysis Memorandum at Attach. 9 (INT_094966)).  Commerce has not presented evidence to demonstrate that IAS 20, or any similar accounting standard, was applicable to Insular Rattan's 2008 statement.[7]

Other financial statements have been found reliable, and Commerce is not without information necessary to calculate surrogate financial ratios.  Further, given the missing tax line item, and its impact on the overall reliability of the statement, including its profit line item and the possibility of subsidies, Commerce's conclusion that Insular Rattan's statement is the best available information is not supported by substantial evidence.

---

[7] Defendant argues that AFMC cannot challenge the applicability of IAS 20 or whether the reporting of subsidies is required because AFMC did not raise these issue below and thus, failed to exhaust its administrative remedies.  Def.'s Resp. 9.  The applicable date of IAS 20 is readily apparent from the record.  See Final Analysis Memorandum at Attach. 9 (INT_094966). Regardless of exhaustion on this particular issue, Commerce's determination to rely on Insular Rattan's financial statement is not supported by substantial evidence, and it cannot stand.

## III.     Zeroing

Fairmont requests that the court stay consideration of zeroing here because the issue of zeroing is currently pending before the Federal Circuit in a different case.   Fairmont Ctms. 5.   When and how to stay proceedings is within the sound discretion of the court. Cherokee Nation v. United States, 124 F.3d 1413, 1416 (Fed. Cir. 1997) (citing Landis v. N. Am. Co., 299 U.S. 248 (1936)).  A pending appeal in a different case is not always a good reason to issue a stay, and Fairmont has not identified any other reason to delay moving this case to its conclusion.  See Gerald Metals, Inc. v. United States, 22 C.I.T. 1009, 1012 (1998) (declining to stay proceedings pending an appeal on the same issue in a different case because the court cannot speculate as to what might happen on appeal).   Thus, Fairmont's request is denied.

In Dongguan, the court granted Defendant's request for a voluntary remand to supply an explanation for its zeroing methodology.  865 F. Supp. 2d at 1224.  In the Remand Results, Commerce justified its zeroing methodology by, inter alia, noting the inherent differences between average-to-transaction comparisons in administrative reviews and average-to-average comparisons in investigations.  Remand Results at 16–27.  As no party has challenged Commerce's explanation on remand and as Commerce's explanation here is in line with the explanation sustained in Far E. New Century Corp. v. United States, 867 F. Supp. 2d 1309, 1312 (CIT 2012), Grobest & I-Mei Indus. (Viet.) Co. v. United States, 853 F. Supp. 2d 1352, 1362 (CIT 2012), and Union Steel v. United States, 823 F. Supp. 2d 1346 (CIT 2012), the court sustains Commerce's explanation for its zeroing methodology.

**CONCLUSION**

For the foregoing reasons, Commerce's <u>Remand Results</u> are remanded for

Commerce to reconsider the determination of Fairmont's partial AFA rate and for Commerce to

reconsider its decision to rely on Insular Rattan's financial statement in calculating surrogate

financial ratios.  If Commerce calculates a different separate rate for Fairmont, Commerce shall

make appropriate adjustments to the separate rates of the parties before the court in this litigation.

In all other respects, the <u>Remand Results</u> are sustained.  Commerce shall file its

remand determination with the court by May 20, 2013.  The parties have until June 10, 2013 to

file objections, and the Government has until June 20, 2013 to file a response.


                                                          <u>/s/ Jane A. Restani</u>
                                                            Jane A. Restani
                                                                 Judge


Dated: This 5th day of April, 2013.
            New York, NY